Argued 29 March, decided 28 May, rehearing denied 22 December, 1907.

## KRAMER v. WILSON.

90 Pac. 183.

DEED AS A MORTGAGE—EFFECT OF EVIDENCE.

1. A review of the evidence leads to the conclusion that the deed under consideration was in fact a mortgage to secure advances made by the grantee.

EFFECT OF MORTGAGE DEED—PAROL EVIDENCE.

2. A deed intended as a security will be treated as though it were a mortgage and its true nature may be shown by·parol evidence.

FORM OF DECREE ON FORECLOSURE OF SECURITY AGREEMENT.

3. In view of Section 5339, B. & C. Comp., providing that no mortgage shall be construed as implying a covenant to pay the sum secured, and, in the absence of such a covenant or other instrument to secure such payment, the remedy of the mortgagee shall be confined to the lands mentioned in the mortgage; the decree foreclosing a deed given as a mortgage should direct only a sale of the property and an application of the money received to the payment of the costs and disbursements and the debt, without any personal or deficiency judgment.

From Josephine: HIERO K. HANNA, Judge.

Statement by MR. COMMISSIONER SLATER.

This is a suit by Willis Kramer against H. L. Wilson and others filed as an answer to an action at law brought by Wilson against Kramer.

On July 18, 1904, W. G. Palmer and his wife conveyed to plaintiff, by deed absolute in form, 11 quartz mining claims in Josephine County, together with a mill site and ditch with water rights. The consideration expressed in the deed is the sum of $30,000. On the same day, and as a part of the same transaction, plaintiff executed a contract note in favor of Palmer in the following form:

"$6,000.00.                    Grants Pass, July 18, 1904.

For value received, I promise to pay to W. G. Palmer, or to his order, the sum of six thousand dollars, lawful money of the United States of America, payable at Grants Pass, Oregon, in two installments of $3,000 each, as follows: $3,000 on or before one year from date, and $3,000 on or before eighteen months from date, with interest on said sums after maturity at the rate of eight per cent per annum.

Provided, nevertheless, the above sums of money are understood and agreed to be payable only out of the money arising

from the sale of certain mining claims and property this day conveyed (July 18, 1904) by W. G. Palmer and L. B. Palmer to Willis Kramer, or in case of failure to consummate the sale of said mines now contemplated, then the money due or to become due hereon to be collectible only out of the proceeds of the sale of said claims, the claims herein mentioned being a group of claims and water rights and mill site described in said deed.        Willis Kramer."

A short time prior to March 3, 1906, Palmer assigned the note to H. L. Wilson, who on that day began an action against Kramer to recover the amount of the note; and thereupon the latter filed his cross-complaint in equity, alleging in effect that prior to the making of the deed he was the owner and entitled to a conveyance from Palmer and wife of an undivided one-half interest in all of the property therein described, and that the remaining one-half was conveyed to him as security for $3,500 which he claims Palmer owed him for his one-half of the expenses of operating the mine prior to that time, and to secure the payment of the sum of $3,000 that day advanced by him to Palmer to aid the latter in completing a contemplated sale of his one-half to one W. R. Stewart, that these sums were to be paid him out of the proceeds of the sale, and that the note in question was given by him to Palmer to evidence the latter's rights and interest in the proceeds of the mine, after receiving payment of his own claims. He prays that the deed be declared to be a mortgage upon Palmer's interest to secure these amounts, and that the same be foreclosed and the property sold; that he be paid first out of the proceeds, and the residue, if any, be paid to Wilson; and that the action at law be enjoined and the note ordered canceled and delivered up to plaintiff. Palmer and wife were made defendants, and all answered jointly, denying that Palmer was indebted to Kramer in any amount whatever, or that the deed was intended by the parties to be a mortgage; but alleging in effect that the deed is what it purports to be upon its face; that the properties mentioned therein were sold and conveyed to plaintiff by the defendants, Palmer and wife, for the agreed price of $9,000, of which sum $3,000 was paid on the

making of the deed, and that the note above mentioned was for the balance; that a reasonable time had elapsed since the date of the note in which plaintiff could have sold the mines. A personal judgment for the amount of the note is demanded. There was a decree for defendants dismissing the suit, from which plaintiff appeals.                                REVERSED.

For appellant there was a brief with oral arguments by *Mr. George W. Colvig, Andrew Murray Crawford* and *William P. Lord.*

For respondents there was a brief and an oral argument by *Mr. Robert Glenn Smith.*

Opinion by MR. COMMISSIONER SLATER.

It is admitted by the defendants in their brief that the note is nonnegotiable in character, and subject to any defenses in the hands of Wilson, the assignee, the same as if the action were by Palmer, the payee. The plaintiff and defendant W. G. Palmer on July 18, 1904, the date of the deed and contract, were the owners in common of 11 quartz claims, each owning an undivided half thereof, but the title to most of them then stood in the name of Palmer and his wife. Three of them, in the first instance, belonged exclusively to Palmer, who had agreed to convey a one-half interest therein to Dr. Moore in consideration of the latter doing certain development work thereon. This contract Dr. Moore assigned to plaintiff, who, at the date of the deed and contract, claimed to have carried out fully and performed the terms thereof and to be entitled to a conveyance from Palmer of an undivided one-half interest therein, which claim the testimony clearly shows Palmer then conceded; but plaintiff then also claimed that he was to be reimbursed by Palmer the sum of $3,500, as one-half of his expenditures made over and above the requirements of the Moore contract in developing and operating the mine. This latter claim Palmer now earnestly resists, but we are of the opinion that the evidence tends strongly to show that in negotiations for the sale of the mine, to be hereafter mentioned, Palmer also admitted and was willing to allow

the payment to plaintiff of that amount out of the proceeds of the mine when sold. Besides the three claims mentioned, eight others immediately adjoining were located by Palmer in his and his wife's names and in the name of plaintiff, all of which it was understood were to be the joint property of plaintiff and Palmer. The parties had failed to get any appreciable returns from the mine. Palmer was without means to assist further in operating or developing the mine or to make settlement with plaintiff for the past expenses claimed by him. At the same time Palmer was in pressing need of money to defray his family and other private expenses. For this reason, he desired to sell his interest in the mine, but plaintiff, having confidence in the ultimate success of the mine, did not wish to part with his interest, but was desirous of assisting Palmer in making a sale of his interest to some one financially able to assist in carrying on the development of the mine. This was the admitted situation and condition of the principals immediately prior to and at the time of the making of the note in question, and it is in the light afforded by this situation that the subsequent acts of the parties when making the deed and note are to be interpreted, and the intention of the parties ascertained.

About this time Stewart sought to purchase all of the mines, but Kramer, not desiring to sell, offered to purchase from Palmer his one-half of all the claims and water rights appurtenant thereto, and negotiations to that end were carried on between him and Palmer. On July 17, 1904, at Myrtle Creek, Douglas County, they agreed on the sum of $12,500 as the price of the property, but were not able to conclude their bargain as to the times of payment. Stewart offered to pay $3,000 in 30 days, $3,000 in 12 months, and $6,500 in 18 months, of which last payment $3,500 was to reimburse the plaintiff for the excess of his share claimed by him of Palmer in the development of the mine. But Palmer wanted $3,000 cash in hand or paid down on the conveyance of his interest, as his needs were pressing, and he could not well afford to wait 30 days for the first payment. It seems that Stewart was not prepared to meet this

demand, but assured the parties, Kramer being among them, that he could make arrangements to make the first payment in 30 days, and this was the best he could do in the premises, which necessarily prevented the direct consummation of the sale by the parties themselves, and, if brought about at all, must be accomplished through some other means or by the aid of some other party. And here is where the differences between the parties arose. Palmer contends that he broke off negotiations with Stewart, and then sold to plaintiff his interest for $9,000, of which $3,000 was paid at the time and the note given for the balance, while the latter claims that, to prevent the sale to Stewart from entirely failing, he, at Palmer's request, "took up the deal," advanced to him the much needed first payment of $3,000, and gave him the note or contract sued on; that at the same time Palmer and his wife conveyed to plaintiff the whole of the mining property, one-half of which he was previously entitled to, and the other one-half to be sold to Stewart for the benefit of Palmer, and to pay himself the $3,000 advanced and the $3,500 claimed by him of Palmer.

It will be observed that the deed and the note were executed on the same day and constitute the written part of the transaction, and must be construed together, taken in connection with all the facts, incidents and circumstances which led to their execution, in order to determine the intentions of the parties which must control. The deed is absolute in form, but plaintiff claims that it is a mortgage. "The course of decisions in this class of cases," says ASHBURN, J., in *Slutz* v. *Desenberg,* 28 Ohio St. 371, 378, "indicates that courts are vigilant to discover whether a condition of defeasance in law or fact attaches to the deed absolute in form. To this end they scrutinize the prior pecuniary relations of the parties, each toward the other, contemporaneous acts bearing on the question, all after acts and admissions of the parties that are competent to be considered as evidence in relation to the transaction, any material inadequacy of consideration, and the terms of any written agreement entered into by the parties." Looking at the instru-

49 OR.—— 22

ments, the deed, and the note, they appear to be inconsistent with any intention of a sale as between Palmer and Kramer; at least they strongly support plaintiff's theory of a mortgage, as well as refute defendant's theory of a sale. An actual sale is the transfer of property from one person to another, and includes the actual and complete transfer of the title. A conditional sale of land is a purchase for a price paid or to be paid, to become absolute in the purchaser on the occurrence of a particular event, or it is a purchase accompanied by an agreement to resell to the grantor in a given time for a given price. While the deed in form is an absolute conveyance, yet the note, which is a part of the same transaction, contains a proviso to the effect that it is understood and agreed between Palmer and Kramer that the sum of money mentioned therein is payable only out of money arising from the sale of the property conveyed by the deed "or, in case of failure to consummate the sale of said mines now contemplated, then the money to be collectible only out of the proceeds of the sale of said claims."

The conditional words of the note clearly indicate that there were then negotiations for a sale of the property other than between Kramer and Palmer, and, if consummated, the property was to be conveyed to the purchaser, not named in the note, but clearly "understood and agreed" upon by Palmer and Kramer, and therefore identified and known. This "sale now contemplated," if "consummated," was to have the effect of taking the title out of Kramer and transferring it to the purchaser. This is inconsistent with the deed to Kramer, if construed as transferring the title absolutely to him. If a sale had been made to Kramer, he would have absolute dominion over it, with power to retain it or to dispose of it as he might see fit. No other person could sell the property, nor could any sale previously contracted to be made of the property by its owner take the title away from him. This indicates that Kramer was not holding the title as owner, but in some other capacity not disclosed by the note, and presumably not inconsistent with his conveying the property for the owner to some other person according to

an agreement between them. But, in case that sale is not "consummated," the condition provides that the amount of money named is "only to be collectible out of the proceeds of the sale of said claims." If the sale contemplated failed by default of the purchaser, then another purchaser was to be sought, and, if a sale was made, the same result as to payment applies in the last as in the first case. Now, as a sale of the property is contemplated by the note for its payment, and one already bargained for at the date of its execution and of the deed, and, in case of failure to complete it, then provision being made for another sale to have the same purpose, which would be after the execution of the note and deed, affords very strong, if not conclusive, proof that the deed to Kramer was not absolute, nor intended to be so by the parties to it, but that Kramer was to hold the title to serve some other purpose, understood by him and Palmer and not disclosed on the face of the note and requiring extraneous evidence to explain.

1. Recurring now to the testimony, and applying it to the wording of these instruments, as explained and discussed, to ascertain the real nature of the transaction, we find that on the day previous to the day on which the note and deed were made Palmer was negotiating with Stewart for the sale of his one-half of the mining property described in the deed. Kramer was present, and was assisting in furthering the negotiations, as it was to his interest to do so. The parties agreed upon the price, which was to be $12,500. Stewart offered to pay $3,000 in 30 days, $3,000 in one year, and $6,500 in 18 months, and out of this last payment Kramer was to be paid $3,500 on account of his expenditures in the development of the mine. All this was satisfactory to Palmer, except he wanted the first payment to be cash in hand to meet his pressing personal needs, which, it seems, Stewart was not able to furnish. Stewart went so far as to examine the title to the property, and, finding the interests unequally divided between Kramer and Palmer, and a part in the name of Palmer's wife, he told them they must straighten out the title between themselves before he could proceed with

the sale; but he was expecting to complete the arrangement and provide the money at the time he named for the first payment, and evidently Kramer and Palmer so understood. Palmer swears he told Stewart the trade was off, and that he then sold to Kramer for $9,000. But the terms of the note appear to contradict him on this point, for it speaks of a sale then contemplated, and no other contemplated sale is mentioned in the record than the one to Stewart. Nor does it appear to be reasonable that Palmer would break off a prospective sale at a price of $12,500 and immediately resell to Kramer for $9,000. The former makes no explanation why he reduced the price by that amount. Kramer denies that he bought the property or had any intention to buy, but he says that he left Stewart and Palmer talking together about the matter and went to his flouring mill; that a short time afterwards Palmer came to the mill and told him the differences between himself and Stewart, which were preventing the consummation of the sale, and asked Kramer "to take up the deal" with Stewart, as he (Kramer) could do better. Kramer agreed to do this, and the parties on the next day went to Grants Pass to conclude the arrangement. He also swears that at Palmer's request he advanced him $3,000, the amount of the expected first payment from Stewart, depending upon this sale for his reimbursement of this money as well as for his former advances, amounting to $3,500, and that he gave to Palmer the contract note mentioned in the pleadings as an evidence of Palmer's remaining interest in the expected purchase price of the mine, and took the deed to the property to secure a title to his one-half and to secure the repayment of these amounts out of Palmer's one-half. This explanation is consistent with the terms of the note. After a careful examination of all the testimony in the case, this appears to us to have been the purpose and intention of the parties in executing these instruments.

2. The equitable rule to be applied is that, when title to property is taken as security for indebtedness, loans or advances, a court of equity will declare the title to be held as a security, and the instrument, even though in the form of an absolute

deed, to be a mortgage, and in default of payment will foreclose the same as though it had been in form a mortgage in the first instance; and parol evidence is admissible to show that such deed or conveyance, although on its face purporting to be a deed, is in reality a mortgage, and the title held as security: *Hurford* v. *Harned,* 6 Or. 362, 363; *Stephens* v. *Allen,* 11 Or. 188 (3 Pac. 168); *Swegle* v. *Belle,* 20 Or. 323 (25 Pac. 633); *Adair* v. *Adair,* 22 Or. 115 (29 Pac. 193); *Lovejoy* v. *Chapman,* 23 Or. 571 (32 Pac. 687). To determine whether an instrument in form of a deed is in fact a mortgage, the test is the existence or non-existence of a debt at the making of the instrument; and, if there was, did the making of the instrument extinguish the debt after the execution of the instrument or instruments? 20 Am. & Eng. Ency. Law (2 ed.), 940. The contention is that the transaction was an absolute sale, but the conditions of the note, taken in connection with the testimony in the case revealing the circumstances under which the transaction was commenced and executed, preclude the idea of an actual sale. Nor was there a conditional sale, for there is no agreement to resell, nor an option to repurchase, as between Kramer and Palmer, for a given price within a given time. Hence we cannot but conclude that the deed was intended by the parties as a mortgage upon Palmer's one-half interest to secure Kramer for his claim of $3,500, which was to be paid out of the proceeds of the sale of the mine and his advances of $3,000 to Palmer at the time of the execution of the instruments, and that the note in question was to be paid only out of the remainder of the anticipated proceeds from the sale of the mine. Chancellor Kent says: "The test of the distinction is this: If the relation of debtor and creditor remains, and a debt still subsists, it is a mortgage; but if the debt be extinguished by the agreement of the parties * * and the grantor has the privilege of refunding, if he pleases, by a given time, and thereby entitle himself to a reconveyance, it is a conditional sale": 4 Kent's Comm. 144, note. But in this case there is no option to repurchase, "no privilege, if he pleases, of refunding," but an obligation to liquidate a debt existing

before as well as one created at the execution of the instruments. The liability of Palmer for them remained, and was not discharged, as the evidence plainly discloses, showing that the relation of debtor and creditor did exist and continued, which brings the case squarely within the test applied.

3. By Section 5339, B. & C. Comp., it is provided:

"No mortgage shall be construed as implying a covenant for the payment of the sum thereby to be secured; and when there shall be no express covenant for such payment contained in the mortgage, and no bond or other separate instrument to secure such payment shall have been given, the remedies of the mortgagee shall be confined to the lands mentioned in the mortgage."

In this case, there being no bond or other separate instrument to secure the payment to plaintiff of the advances found to be due him, the relief granted to him must be confined to declaring the deed to be a mortgage upon Palmer's undivided one-half interest in the property described in the deed to secure the payment of $6,500, with legal interest from the date thereof, and ordering a sale of the property, and after the payment of the costs and expenses of sale, and of the amount due plaintiff, the remainder, if any, be paid to defendant Wilson in full satisfaction and payment of the note in suit.

The decree of the lower court should be reversed and one entered here in accordance herewith.        REVERSED.